SILVER & CO. v. J. P. EUSTIS MFG. CO. et al.

(Circuit Court, D. Massachusetts. January 5, 1906.)

PATENTS—VALIDITY AND INFRINGEMENT—BATH-SEATS.

> The Silver patent, No. 736,032, for a bath-seat, consisting of a wooden board, which is reversible, and having holes extending into the ends in which the arms of bent wire hangers are inserted and held solely by frictional contact, being removable and adjustable to adapt the seat to bath-tubs of different widths, while for a simple device, discloses invention, and was not anticipated nor invalidated by prior public use. Also *held* infringed by one structure made by defendants, but not by another.

In Equity.

See 130 Fed. 348.

Stephen J. Cox and Wm. Reed Bigelow, for complainant.
George S. Wheelock and Donald Campbell, for defendants.

HALE, District Judge. This suit in equity is brought for the infringement of patent No. 736,032, to William H. Silver, dated August 11, 1903, for improvements in bath-seats. Both claims of the patent are alleged to be infringed. Those claims are as follows:

"(1) An improved bath-seat comprising a pair of supports, of round wire, having bends whereby each is provided with a top portion adapted to rest on the rim of a bath-tub, a pair of straight arms parallel with each other and substantially parallel with said top portion, and portions connecting said top portion and straight arms, all in one part, and a seat-board of wood having cylindrical holes, parallel with each other and with the top and bottom of the board, and extending into its ends, which holes receive said straight arms and frictionally coact therewith on all sides, whereby the seat-board is adapted to be turned over when one side is marred or imperfect, and the supports are adapted to be adjusted for tubs of different widths and are held against displacement by friction.

"(2) An improved bath-seat consisting of a pair of supports, of round wire, having bends whereby each is provided with a top portion adapted to rest on the rim of a bath-tub, a pair of straight arms parallel with each other and substantially parallel with said top portion, and portions connecting said top portions and straight arms, all in one part, elastic tubing covering said top portions and the adjoining ends of said connecting portions, and a seat-board of wood having cylindrical holes, parallel with each other and with the top and bottom of the board, and extending into its ends, which holes receive said straight arms and frictionally coact therewith on all sides, substantially as hereinbefore specified, for the purposes set forth."

In order to find the inventive thought of the patentee, it is useful to examine carefully the specification, as well as the claims. The specification, at the outset, says:

"This invention relates to devices for use in ordinary domestic bath-tubs to facilitate their use as foot-baths and the like; and it consists in a rigid seat having supporting devices of novel construction whereby it is readily adapted to tubs of any width and is securely held in place without fastenings, and the seat-board is adapted to be turned over for use on its other side when one side is marred or imperfect."

The details of construction are further described with minuteness. In quoting this description, I do not give the letters and figures, as it would only tend to confuse. In other respects, I quote the exact words of the description of details:

"The improved seat is composed of a pair of supports and a rigid seat-board. The latter is made in one part of suitable wood, except that its rounded ends are or may be provided with metallic wear plates or strips, preferably of brass, which may be held in place by wood screws or in any approved manner. Extending longitudinally into the ends of the seat-board through the strips are cylindrical holes in two pairs, parallel with each other and with the top and bottom of the seat-board, and the supports terminate in straight arms, parallel with each other and snugly fitted to said holes so as to be movable lengthwise within them to adjust the seat to the width of the tub. The supports are held in position by the frictional contact of the wood with the straight arms on all sides. The remainder of each of the supports consist of a top portion substantially U-shaped, and substantially parallel with its pair of arm portions, substantially vertical portions, connecting the sides of the top portion with the arm portions, and elastic tubing covering the top portion and the adjoining ends of the connecting portions. * * * The coverings of the pair of supports serve not only to prevent the defacement of the rims of bath-tubs by scratching, but also to resist the movement of the supports toward each other when the seat is in use. * * * The supports may be readily separated from the seat-board at will, as to facilitate boxing seats for shipment or putting the seat out of sight, and reassembling

the parts is facilitated, as the supports are interchangeable. Either side of the seat-board may be its top, and there are no screws or other fastenings to be manipulated. * * * The seat-board may, if preferred, be shaped or covered, the metallic strips, which serve to keep the holes from spreading in soft wood, may be omitted when the wood is sufficiently hard, and other like modifications will suggest themselves to those skilled in the art."

The thought in the mind of the inventor was evidently:

First. To produce a bath-tub seat adaptable to different widths of tubs, in which the hangers are connected to the seat-board without intervening fastenings of any kind.

Second. To provide a seat-board of wood, having cylindrical holes extending into its ends, in which the arms of the hangers are connected with the board by frictional contact, and in such manner that the hangers and board may be adjusted with relation to each other, or separated without the manipulation of any other parts.

Third. To provide a seat in which the seat-board is reversible, so that one side may be used after the other is worn or disfigured.

The pith of the invention is to provide a simple seat readily adaptable to different widths of tubs, without screws or other metallic devices, the width of the seat being regulated by the arms entering the end of the wooden seat, by holes in the board, the arms arranged to snugly fit into the holes, so that they may be adjusted to any width without screws or other metal liable to rust. The holes are kept from spreading, if the wood is soft, by means of metallic strips at the end of the board.

The testimony tends to show that the device, though simple, became attractive to the public, filled a want in the market, met with large sales, and became actually useful and successful.

1. The defense of anticipation is set up and urged with great earnestness and ability by the learned counsel for the defendants. The patent received a thorough sifting in the Patent Office on interference proceedings, in which the defendant Eustis in his application for a patent alleged that he was the inventor of substantially the invention brought before the court in this suit; and he appears to have had full knowledge of all the patents which are now urged as anticipations.

The Fraser patent, No. 544,615, presents a serious question of anticipation, and one which the court has found it necessary to study with care. This patent was for a slat for bedsteads. It is insisted by the defense that, when very slightly modified by any ordinary workman, the bed slat could be used bodily as a bath-seat, and involves the essential inventive thought of the Silver patent. It is urged, too, that it would not be invention to make the seat of the Silver patent after having seen the Fraser invention, especially having in view the Brown patent, No. 657,640. The Brown patent was for a bath-tub seat; but this seat did not show any sleeves to receive the hanger arms, nor any frictional coaction between the sleeves and the arms. It had the exposed metal parts which it was one main object of the Silver patent to avoid. The examination of the file wrapper shows that the Patent Office had this question before it, and that it was of the opinion that it would not be invention to apply the original de-

vice shown in the Fraser patent to the use shown in the Brown patent. But amendments were filed which it is not necessary here to discuss; and the patent was allowed after giving full weight to the Fraser and Brown patents. After careful examination of the question of anticipation raised by this patent, I am of the opinion that the Fraser bed slat does not present the inventive thought of the Silver invention. The two arts are perhaps not so remote as to prevent a transfer from one to the other without invention, but the pith of the patent in suit is not found in the Fraser invention, among other reasons, from the fact that it has no reversible seat-board. It has no round wire hangers with cylindrical holes to receive them. The length of the seat-board is not changed by frictional coaction of arms and sleeves; but the ends of the slat are hooked over the side rails to prevent the separation of the parts. The inventive idea of the patent in suit is a very simple one; but, in my opinion, it is not found in the Fraser patent.

Of the other patents brought before us in the prior art, it is sufficient to say that none of them show a combination of the three elements of the patent in suit to which I have called attention earlier in this opinion.

2. The defense is made that Silver abandoned the invention to the public by failing to apply for a patent within two years after public use. And it is well urged that a single instance of a prior public use is sufficient to invalidate a patent. But upon the evidence shown in the record the court must find that the use proved in this case was not a public use, but an experimental use. I prefer to decide the case not upon the narrow issue raised that the pleadings and notice are inadequate to bring the attention of the court to the subject. Upon this matter I do not need to express an opinion. Upon a careful examination of the testimony, I am of the opinion that Silver, after making his invention, proceeded to test it by experiment in a manner suitable and proper in order to demonstrate its practicability. This he had a perfect right to do. In doing this, he did nothing, in my opinion, to indicate an intention to surrender his invention to the public. He showed, on the other hand, a purpose to retain control of his invention, and to perfect it. The testimony tends to show that his experimental use was in good faith, for the purpose of testing the qualities of the invention. It is not the purpose of the courts to prevent an inventor from developing his inventive idea by suitable experiments, in the meantime retaining control of his invention for the purpose of making that invention in the end more useful to the public and of more benefit to himself. It is not necessary to discuss the testimony in detail upon this point.

3. It is further urged by the defense that, if there had ever been infringement, such infringement was discontinued; that, while one of the defendants had used at one time seats like the "alleged infringing seat and two hangers," the use of such seats was abandoned; and, after that, the use was of another device upon which the court will comment later in this opinion. On this defense of discontinuance of infringement, the burden is upon the defendants, and I do not find

that there is sufficient testimony to meet this burden. It is not necessary to discuss in detail the evidence upon this point, but simply to announce my conclusion upon the subject.

4. On the question of infringement, two alleged infringing devices are brought before the court. The first device is presented by a seat marked: "Alleged Infringing Seat and Two Hangers." This device presents a wooden reversible seat-board adaptable to different widths of bath-tubs, in which the hangers are connected to the seat-board without intervening fastenings of any kind. It shows a seat-board having cylindrical holes · extending into its ends; but it is urged by the defendants that it does not have the element of close fit or frictional coaction, but that the size of the holes or sleeves which receive the hanger arms in the defendants' seat are about one-eighth of an inch larger than the arms, and permit a very slight movement of the arms therein. Hence the defendants say that the scope of the claims should be narrowed so that they will not cover anything but an absolutely tight fit between the arms and the sleeves, and that this· device of the defendants does not present this absolutely tight fit, and so it is not an infringement. The court cannot sustain this contention. The language of the specification is that the arms should be "snugly fitted to said holes so as to be movable lengthwise within them to adjust the seat to the width of the tub." The claim provides that the "holes receive said straight arms and frictionally coact therewith on all sides. Now, it is true that in the defendants' device the fit is not so snug, but it is snug enough to cause the arms to be movable lengthwise within the holes in order to make an adjustment of the seat to the required width. The coaction is not made with so much friction, but it is made with friction enough to effect the result without screws or metal constructions, which the Silver patent seeks to avoid. The slight modifications which the defendants have made in this structure appear to have been nothing more than the patentee evidently had in mind when he said "other like modifications will suggest themselves to those skilled in the art." A careful examination of the two devices convinces me that, although the defendants' device does not present so close a fit of the parts as the device of the patent in suit, it is still true that the arms have a sufficiently snug fit to come within the meaning of the specification, and that the holes and the arms frictionally coact sufficiently to come within the clear intention of the claims of the patent.

The second feature of construction which the defendants rely upon to escape infringement is the nonparallelism of the hanger arms when removed from the seat-board. It is true that they are not minutely and precisely parallel; but there is not divergence enough from parallelism to avoid the meaning and intention of the specification and claims in the patent in suit. The complainant properly urges that the nonparallelism of the arms and the enlargement of the holes in the defendants' device are differences such as might unintentionally occur in the manufacture of seats intended to be an exact embodiment of the patented structure. The court must hold that the

142 F.—34

defendants' seat marked, "Alleged Infringing Seat and Two Hangers" is clearly an infringement of the patent in suit.

5. Another question is, however, brought before the court by the "New Alleged Infringing Seat." This device of the defendants is manufactured under defendants' patent, No. 764,232, which was not applied for until after this suit was brought. In this device the sheaths or tubes receiving the hanger arms are not in the seat-board. There are no holes in the seat-board. From the analysis which the court gave the specification and claims in the beginning of this opinion, I must come to the conclusion that an essential in the inventive thought of the patentee in the patent in suit was that the seat-board should be of wood; that it should be simple, relieved of metallic construction. The inventor says in his specification that the metallic strips which serve to keep the holes from spreading in soft wood may be omitted when the wood is sufficiently hard. He further says that either side of the seat-board may be its top. His claim calls for a seat-board of wood, having cylindrical holes parallel with each other and with the top and bottom of the board, and extending into its ends. I cannot escape the conclusion that an essential element in the invention was that the hanger arms should enter the ends of the wooden seat; those ends being protected by metallic strips when the softness of the wood required such protection. It was clearly the intention of the inventor to avoid metallic construction so far as possible, in order to avoid rust and dirt. I fail to find infringement of the patent in suit in a construction which places metallic sheaths underneath the wooden seat-board, and does not allow the entering of the hangers into the ends of the seat-board itself. In my opinion the "New Alleged Infringing Device" does not infringe.

6. The court, then, comes to the conclusion that there is nothing in the record to meet the presumption of the patentability which is raised by the patent; that anticipation is not shown in the prior art; that the complainant has sustained the burden required on the issue of infringement in reference to the defendants' device which has been marked, "Alleged Infringing Seat and Two Hangers"; and that this seat of the defendants is clearly an infringement of the patent in suit. But with reference to the new alleged infringing seat, in which the sheath-holes are in metal sleeves upon the lower side of the seat-board, the court is of the opinion that there has been no infringement.

Therefore, upon this record, and in reference to the first alleged infringing device, I must find for the complainant.

There may be a decree, consistent with this opinion, for the complainant, for an injuction and an accounting.

Decree for complainant for injunction and accounting.